UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

—————————————————————— x

Y-GAR CAPITAL LLC,                          :   Civil Action No. 2:19-cv-00695
                                            :
                        Plaintiff,          :   COMPLAINT FOR VIOLATIONS OF THE
                                            :   FEDERAL SECURITIES LAWS
        vs.                                 :
                                            :
CREDIT SUISSE GROUP AG, CREDIT              :
SUISSE AG, CREDIT SUISSE                     :
INTERNATIONAL, CREDIT SUISSE                :
SECURITIES (USA) LLC, TIDJANE THIAM,        :
DAVID R. MATHERS, JANUS                     :
HENDERSON GROUP PLC, JANUS INDEX            :
& CALCULATION SERVICES LLC and             :
JANUS DISTRIBUTOR LLC,                      :
                                            :
                        Defendants.         :
                                            :
—————————————————————— x   DEMAND FOR JURY TRIAL

Plaintiff Y-GAR Capital LLC ("plaintiff"), by its undersigned attorneys, for its complaint against defendants, alleges the following based upon personal knowledge as to its own acts and upon information and belief as to all other matters based on the investigation conducted by and through its attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of Credit Suisse Group AG and Credit Suisse AG (together, "Credit Suisse"), press releases, and analyst reports, media reports and other publicly disclosed reports and information about Credit Suisse and the VelocityShares Daily Inverse VIX Short Term ("XIV") exchange traded note ("ETN").  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This case arises from the destruction of the XIV ETN by Credit Suisse, the note's issuer, promoter and primary beneficiary.  Since the formation of the XIV in 2010, Credit Suisse has sold hundreds of millions of dollars' worth of the security, pocketing the proceeds with the promise to pay investors the economic value of the note, known as the "indicative value," upon redemption.

2.      Credit Suisse marketed the XIV as appropriate for "manag[ing] daily trading risks" and for those who "seek exposure" to volatility markets.  The CBOE Volatility Index, or "VIX," seeks to measure the expected volatility of the S&P 500.  Specifically, the XIV was inversely related to the S&P 500 VIX Short-Term Futures Index ER (the "Index"), an index that tracked volatility and was designed to increase in value when the Index decreased.  While Credit Suisse suggested that the product should be used by "sophisticated" investors, it widely offered and sold the XIV to the investing public without any limitation as to sophistication or accreditation in order to maximize offering proceeds.  In 2017, as markets entered a period of historically low volatility, the value of the XIV rose as thousands of investors poured into the security.  By January 26, 2018, Credit Suisse had

sold approximately 10.8 million XIV ETNs, up from approximately 8.6 million XIV ETNs as of March 13, 2017, a 26% increase in less than a year.

3.      The massive investor influx into the XIV before and during the Relevant Period allowed Credit Suisse to pocket hundreds of millions of dollars.  Credit Suisse and the rest of the defendants named herein earned millions of dollars more for the management of the XIV, including by collecting early redemption fees, daily investor fees, and other charges.  The problem for Credit Suisse was that it remained liable to pay out the indicative value of the XIV ETNs on redemption, which, as of January 26, 2018, totaled nearly $1.5 billion in potential liability.  To erase this potential liability, and earn even greater sums in proprietary trading profits from its insider knowledge of volatility markets, Credit Suisse trigged the latent self-destruct mechanism it had designed into the XIV.

4.      As would only later be revealed, Credit Suisse had misrepresented the true risks and function of the XIV.  Most glaringly, Credit Suisse had failed to disclose in offering documents for the XIV that the ETN was not just "risky," but rigged – designed to self-destruct on market turbulence that *Credit Suisse itself would precipitate*.  Credit Suisse had created the perfect heads-I-win, tails-you-lose product that it could peddle to an unsuspecting public, collecting hundreds of millions of dollars in offering proceeds and management fees from investors, and then pulling the plug to erase its own liabilities and lock in profits when the opportunity presented itself.

5.      From approximately May 1, 2017 to February 5, 2018 (referred to herein as the "Relevant Period"), as investor funds were growing the size of the XIV, dozens of other volatility-linked exchange traded products ("ETPs") experienced similar inflows.  As a consequence of this growth in volatility trading, the markets for VIX futures contracts, S&P 500 Index ("SPX") options, and other volatility-related financial products, such as variance swaps, ballooned.  ETP portfolio

managers such as Credit Suisse and other consumers of volatility-related financial instruments used these products to maintain portfolio leverage and maturity consistent with volatility investment objectives, hedge risks, and place directional bets on volatility.

6.       The proliferation of volatility-related products that relied on dynamic trading in the same VIX futures and SPX option markets created an acute liquidity threat.  This liquidity shortfall was exponentially magnified by the daily portfolio rebalancing of volatility ETPs.  As one of the largest managers of volatility ETPs, Credit Suisse was well aware that at the end of every trading day inverse and leveraged ETPs needed to purchase VIX futures contracts in order to rebalance their respective portfolios and maintain the appropriate leverage ratios.  Given the billions of dollars that had been invested in such ETPs prior to and during the Relevant Period (in addition to the funds invested in similar strategies outside of ETPs), any significant movement in the SPX would cause an outsized movement in VIX futures contracts as market participants rushed to cover short positions, hedge risks, and rebalance investment portfolios in overly crowded volatility markets.  There were simply not enough VIX futures contracts available from liquidity providers to absorb such an event without a run on the market.

7.       Particularly at risk of catastrophic losses were inverse ETPs such as the XIV.  Overall investment in VIX futures during the Relevant Period was net short, as investors piled billions of dollars into bets on low volatility.  As a result, the XIV faced heightened demand in the products it needed to purchase as part of its daily rebalancing and Credit Suisse's daily hedging activities.  Furthermore, the XIV rebalanced its portfolio at the end of each trading day and around the same time as other ETPs.  This meant that the XIV would generally be purchasing VIX futures contracts at times when demand was highest.  In addition, the XIV was subject to the risk of front-running by sophisticated market participants with access to proprietary market data and non-public modelling

capabilities – most notably, Credit Suisse – who had insider visibility into the XIV's rebalancing needs based on market movements during the trading day.

8.      All of these factors set the stage for the XIV to suffer a self-destructive feedback loop trigged by market turbulence:  If volatility significantly increased, market participants (including Credit Suisse) would rush to transact in volatility-related products, which would drive up volatility, thereby driving up the price of VIX futures contracts, thereby decreasing the XIV's indicative value and impacting the value of other inverse and leveraged volatility ETPs, thereby spurring market participants to buy even more VIX futures contracts at higher prices as part of daily rebalancing, hedging activities and opportunistic trading, which would drive up volatility, and so on until the XIV collapsed.

9.      Despite this imminent threat, on January 29, 2018, Credit Suisse offered an additional **16.3 million** XIV ETNs for sale, thereby attempting to more than double the number of XIV ETNs outstanding (the "January 2018 Offering").  In little more than a week, the number of XIV ETNs issued and outstanding ballooned by **nearly 40%**, demonstrating Credit Suisse's rush to flood the market with as many XIV ETNs as possible.  Notably, the registration statement for the January 2018 Offering (the "Registration Statement") made no mention of the acute liquidity risks that already existed from the glut of volatility ETPs, or the threat posed to XIV investors by the historically low volatility environment, or the fact that flooding the market with even more inverse ETNs would exacerbate these risks.  Of course, Credit Suisse as the manager of the XIV and one of the largest participants in volatility markets was uniquely aware of these threats, and its attempt to more than double the number of XIV outstanding via the January 2018 Offering despite the predictable effect of its actions further demonstrates defendants' desire to force the XIV into an acceleration event.

- 4 -

10.     Barely a week after the January 2018 Offering, Credit Suisse's plan to precipitate the destruction of the XIV went into effect.  On Monday, February 5, 2018, the stock market declined, with the SPX dropping 4% amid concerns about rising bond yields and higher inflation.  This market turbulence, which was relatively modest by historical standards, triggered the latent self-destruct mechanism in the XIV.  At the end of the trading day, a peculiar jump in volatility trading caused the underlying Index to surge, as the price of the VIX futures contracts on which it was based skyrocketed and dislocated from underlying fundamentals due to the dangerous lack of liquidity detailed herein.  The price of XIV ETNs, which track the inverse of the Index, fell.  By the close of trading on February 5, 2018, the price of XIV ETNs had dropped to $99 per ETN, from the prior close of $115.55 per ETN, a 14% decline.

11.     However, the real carnage occurred in the afterhours, as Credit Suisse and other ETP portfolio managers sought to rebalance ETP portfolios to maintain appropriate leverage amounts in an illiquid VIX futures market.  In addition, Credit Suisse, armed with its insider knowledge of the VIX futures market as manager to one of the largest inverse ETPs on the market, engaged in extensive proprietary trading activities against the interests of XIV holders, under the guise of "hedging."  As Credit Suisse and other market participants rushed to purchase VIX futures contracts, prices skyrocketed, initiating the built-in death spiral and eviscerating the value of XIV ETNs.

12.     On February 5, 2018, at 4:00 p.m. ET, the regular-hours market for the trading of the XIV closed.  At close, the XIV's last trading price was $99 and its indicative value was reported at $72.59.  Thirty minutes later, during the after-hours market, the price per XIV ETN had dropped to $65.50, while its reported indicative value had plummeted to $24.89.  By 4:45 p.m., the price had further dropped to $42.81.  Finally, by 6:30 p.m. the trading price of XIV had declined to

approximately $10 per ETN (as the indicative value settled at a mere $4.22), a *90% decline* from its closing price, as Credit Suisse's plan to destroy the XIV went into effect.

13.     By February 6, 2018, the price of XIV ETNs plummeted to a low of $5.50, a one-day decline of over *94%* from the prior day's close.  The XIV essentially became the engine of its own demise, as investors suffered massive losses not simply due to volatility in equity markets, but due to the XIV's very design and its participation in – and catalyst for – an illiquid VIX futures market, as precipitated by Credit Suisse.  The following chart illustrates the dramatic decline in the price of XIV ETNs, which essentially wiped out the product's entire investment gains over the proceeding *seven  years* in a matter of minutes:



14.     Investor losses were staggering.  In a matter of minutes, billions of dollars invested in inverse and leveraged ETPs – including *more than $1.5 billion* in XIV investments – evaporated in one of the greatest wealth-destruction events since the 2008 financial crisis.  Media commentators described the shocking and complete collapse of the XIV and similar products in suitably cataclysmic terms such as "Armageddon" and the "Volpocalypse."  Others noted that investors had been "blindsided" as latent risks in the XIV and other inverse and leveraged ETPs materialized, exposing fatal design flaws that made the products far riskier than disclosed by defendants.

15.     On February 6, 2018, as a consequence of the market wreckage, trading in the XIV was temporarily halted by market regulators.  That same day, Credit Suisse announced that the sharp decline in the price of XIV ETNs had triggered an "acceleration event" under the terms of the XIV, allowing Credit Suisse to force redemption of the notes for pennies on the dollar.  Investors would ultimately receive only $5.99 for each XIV ETN, even though millions of notes had been offered to investors for prices as high as $134 per ETN a little more than *one week* before the February 5, 2018 wealth destruction event.

16.     The collapse of the XIV was a windfall for Credit Suisse, which overnight eliminated approximately *$1.5 billion* in redemption liability.  Credit Suisse also retained hundreds of millions of dollars in offering proceeds from the sale of XIV, and millions more from its daily management of the XIV through its affiliates.  Adding further insult to injury, Credit Suisse *profited* through the proprietary trading of volatility-related securities at this same time, based on its insider knowledge and outsized role in the volatility markets, at the expense of XIV investors.  For example, in reporting its first quarter 2018 earnings results, Credit Suisse revealed that it had generated about *$490 million* in revenues from its equity sales and trading division during the quarter, a 30% sequential increase.  Credit Suisse stated that the results were "due to more favorable trading conditions, particularly higher levels of volatility which benefited our derivatives business."

17.     On February 23, 2018, *Bloomberg* reported that both the SEC and the Commodity Futures Trading Commission were investigating whether wrongdoing contributed to the steep losses for volatility-linked ETPs on February 5, 2018.  Later, FINRA launched its own investigation into whether broker dealers made unsuitable recommendations and misrepresentations or failed to make required disclosures to investors in VIX-related ETPs such as the XIV.  While defendants may now seek to mitigate regulatory scrutiny, their failure to fully disclose the true risks of the XIV has

caused investors, including plaintiff, to suffer millions of dollars in economic losses and damages under the federal securities laws.

## JURISDICTION AND VENUE

18.     The claims alleged herein arise under §§11 and 15 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §§77k and 77o, and §§9, 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §§78i, 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the 1933 Act, and §27 of the 1934 Act.

20.     Venue is proper in this District pursuant to §22 of the 1933 Act, §27 of the 1934 Act, and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.  Plaintiff resides in this District. Defendants marketed and sold XIV ETNs to members of the investing public, including plaintiff, who reside in this District and suffered losses as a result of those purchases as detailed herein.

21.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the Nasdaq Stock Market ("Nasdaq"), a national securities exchange.

## PARTIES

22.     Plaintiff Y-GAR Capital LLC purchased XIV ETNs pursuant to the Registration Statement, as set forth in the accompanying Exhibit A incorporated herein by reference, and has been damaged thereby.

**Credit Suisse Defendants**

23.     Defendant Credit Suisse Group AG is a Swiss multinational financial services holding company with its headquarters in Zurich, Switzerland.  It owns 100% of the equity interest in defendant Credit Suisse AG, its primary operating subsidiary.

24.     Defendant Credit Suisse AG is the direct bank subsidiary of Credit Suisse Group AG and is domiciled in Zurich, Switzerland.  Credit Suisse AG issued the XIV ETNs, for which it received hundreds of millions of dollars in offering proceeds.  The composition of the Executive Board of Credit Suisse Group AG and Credit Suisse AG is identical, with the exception of one individual not named in this complaint.  Because Credit Suisse Group AG and Credit Suisse AG are, as a practical matter, synonymous, both entities are referred to herein as "Credit Suisse."

25.     Defendant Credit Suisse International ("CSI") is a subsidiary of Credit Suisse AG that is domiciled in London, the United Kingdom.  As of December 31, 2018, Credit Suisse AG and Credit Suisse Group AG held 98% and 2% of the voting rights and a 98% and 2% of the equity interest in CSI, respectively.  CSI is one of four "major" subsidiaries of Credit Suisse that "account for a significant portion of [Credit Suisse]'s business operations."  CSI, together with defendant Janus Index & Calculation Services LLC, served as the Calculation Agent for the XIV.

26.     Defendant Credit Suisse Securities (USA) LLC ("CSSU") is a United States-based broker-deal for Credit Suisse, headquartered in New York, New York.  Its equity is 100% owned by Credit Suisse.  CSSU served as an underwriter and placement and redemption agent for the XIV.  CSSU charged a creation fee of up to approximately 0.15% times the closing indicative value of the XIV on the date on which Credit Suisse priced new notes and charged investors a redemption charge of 0.05% times the closing indicative value on any XIV ETNs that were redeemed earlier than the redemption date at the investor's option.

27.     Defendant Tidjane Thiam ("Thiam") has served as the CEO of Credit Suisse and as a member of the Executive Board at Credit Suisse since 2015.  As part of his duties as CEO, defendant Thiam was a member of the Capital Allocation and Risk Management Committee ("CARMC").

28.     Defendant David R. Mathers ("Mathers") has served as the CFO of Credit Suisse and a member of the Executive Board since 2010.  Mathers also serves as CEO of CSI.  As part of his duties as CFO, defendant Mathers was a member of the CARMC and the chair of the Valuation Risk Management Committee ("VARMC").

29.     Defendants Thiam and Mathers together are referred to herein as the "Individual Defendants."  The Individual Defendants, in part because of their positions with Credit Suisse, possessed the power and authority to control the contents of Credit Suisse's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers and investors, *i.e.*, the market.  Each Individual Defendant made or controlled the public statements alleged herein to be false or misleading, including in the Registration Statement, and had the ability and opportunity to prevent those statements from being disseminated to the market or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or misleading.

30.     Credit Suisse Group AG, Credit Suisse AG, CSI, CSSU, Thiam and Mathers are collectively referred to herein as the "Credit Suisse Defendants."

**Janus Defendants**

31.     Defendant Janus Henderson Group plc ("Janus") is a global asset management holding company based in London, the United Kingdom.  Janus acquired VelocityShares LLC ("VelocityShares"), a Connecticut-based asset manager, in 2014.  In July 2015, VelocityShares and

- 10 -

its division, Velocity Index & Calculation Services, were renamed as Janus Index & Calculation Services LLC.  Following a merger with Henderson Group in May 2017, Janus completed the acquisitions of these relevant controlled entities: VS Holdings Inc., Janus Index & Calculation Services LLC, and Janus Distributors LLC.  In 2017, Janus Distributors LLC began doing business as Janus Henderson Distributors.  Janus, through its VelocityShares subsidiary, is the original creator of the XIV, together with Credit Suisse.  In November 2010, Credit Suisse entered into a non-exclusive license agreement with Janus Index & Calculation Services LLC to license for a fee, the right to use certain XIV and VelocityShares trade names, trademarks and service marks, which are owned by Janus.  Janus's subsidiary Janus Index & Calculation Services LLC  serves as a Calculation Agent for the XIV, and its subsidiary Janus Henderson Distributors  markets and places XIV ETNs.

32.     Defendant Janus Index & Calculation Services LLC ("JIC") is a Delaware limited liability company.  JIC is 100% owned by defendant Janus.  Prior to July 2015, JIC was known as Velocity Index & Calculation Services. JIC, through VelocityShares, created the XIV.  In addition, JIC served as the calculation agent for the XIV, together with defendant CSI.

33.     Defendant Janus Distributors LLC is a Delaware limited liability company doing business as Janus Henderson Distributors ("JHD").  JHD is 100% owned by Janus.  Prior to July 2015, Janus Distributors LLC was known as Velocity Index & Calculation Services.  JHD received all or a portion of the Daily Investor Fee in consideration for its role in marketing and placing XIV ETNs.  The Daily Investor Fee was equal to the product of: (1) the closing indicative value of the XIV on the immediately preceding calendar day times, (2) the Daily ETN Performance for that series on the calculation day, times (3)(a) the Daily Investor Fee Factor for the XIV (which equaled 0.0135) divided by (b) 365.

34.    Janus, JIC, and JHD are collectively referred to herein as the "Janus Defendants."

## SUBSTANTIVE ALLEGATIONS COMMON TO ALL CLAIMS

**Background to the XIV**

35.    The XIV was an exchange traded note, or "ETN," issued and sold by Credit Suisse, and placed and marketed by Janus.  ETNs are unsecured debt obligations of financial institutions with a redemption value, known as the "indicative value," based on the performance of an underlying index.  Inverse ETNs calculate their indicative values by the inverse of the performance of the underlying index.  On redemption, the issuer is obligated to pay the holder of the note an amount equal to the indicative value.  However, ETNs may trade on an exchange at a premium or a discount to the indicative value, for example if the indicative value is expected to increase or decline prior to redemption or due to the effects of supply and demand.

36.    The CBOE Volatility Index, or "VIX," seeks to measure the expected volatility of the S&P 500.  Volatility is the range of price change a security experiences over a given period of time.  If the price remains relatively stable, the security has low volatility.  If its price fluctuates, the security has greater volatility.  Because the VIX measures expected market swings and uncertainty, it is sometimes referred to as the market "fear gauge."  Cboe Global Markets, Inc. ("CBOE") calculates the VIX pursuant to a complicated formula that takes as inputs the market prices of call and put options on the SPX with an average expiration of 30 days.

37.    The XIV is benchmarked to the S&P 500 VIX Short-Term Futures Index ER (the "Index"), an investable index of VIX futures contracts with the ticker symbol "SPVXSP."  Specifically, the VIX futures contracts comprising the Index represent the prices of two near-term VIX futures contracts, replicating a position that rolls the nearest month VIX futures to the next month VIX futures on a daily basis in equal fractional amounts.  This results in a constant weighted average portfolio maturity of one month.

38.     The investment objective for the XIV was to achieve results for a single day that matched (before fees and expenses) the inverse (-1x) of the daily performance of the Index.  For example, if the Index decreased 5% on a given day due to low market volatility, the investment objective of the XIV was to increase 5% that same day.  This would be accomplished by the buying and selling of VIX future contracts, SPX option contracts, or other derivatives or synthetic instruments tied to VIX futures contracts and SPX options.  In addition, Credit Suisse engaged in daily hedging activities to offset its liabilities to ETN holders, again by buying and selling VIX futures contracts, SPX options, and/or derivative or synthetic instruments tied to these markets.

39.     Investors cannot invest directly in the VIX, but instead must invest in securities such as the XIV tied to the VIX.  Investing in such volatility-related products can be used as a means to hedge investment risks and diversify an investment portfolio.  For example, the Registration Statement described the XIV as a "trading tool[]" for investors to "manage daily trading risks" by investing in volatility. It continued in pertinent part:

> The return on the ETNs of any series will be based on the performance of the applicable underlying Index during the term of such ETNs. . . .   Each Index is intended to reflect the returns that are potentially available through an unleveraged investment in the relevant futures contract or contracts on the VIX Index.

40.     Credit Suisse first began issuing the XIV in 2010.  The notes had a maturity date of December 4, 2030, or approximately 20 years from issuance.  In 2017, as the markets entered a period of historically low volatility, the XIV became popular as a means to manage trading risks among investors.  The overwhelming majority of these were retail investors.  According to *Morningstar Inc.*, "[j]ust one fifth of XIV's outstanding shares are owned by funds and institutions," indicating that "retail investors could own a sizeable chunk of the volatility product."

41.     As of January 26, 2018, there were approximately 10.8 million XIV ETNs issued and outstanding, up from approximately 8.6 million as of March 13, 2017, a 26% increase in less than a

year.  The closing indicative value for the XIV as of January 26, 2018 was $134.14 per ETN.  Thus, at the time, Credit Suisse was exposed to nearly $1.5 billion in redemption liability as a result of then-issued and outstanding XIV ETNs.

42.     The lower the indicative value of the XIV, the less Credit Suisse would be obligated to pay an XIV holder on redemption.  As stated in the Registration Statement: "If the Final Indicative Value is zero, the Maturity Redemption Amount will be zero."  Consequently, Credit Suisse was highly incentivized to drive the value of the XIV ETNs as close as possible to zero prior to redemption, in order to reduce its $1.5 billion in potential liability and minimize the amount it would need to pay out to XIV holders.  At the same time, Credit Suisse could retain the hundreds of millions of dollars in proceeds it had received from the offer and sale of XIV ETNs.

43.     Credit Suisse also had the means to directly influence the value of the XIV by virtue of its role as one of the largest market participants in the volatility markets, including the market for VIX futures.  Credit Suisse could directly influence the VIX futures markets as a result of its daily rebalancing and hedging activities related to the XIV, one of the largest volatility-linked ETPs in existence, and other volatility ETPs it had issued and managed.  These activities, in turn, would influence the Index and thereby the indicative value of the XIV and the amount that Credit Suisse would have to pay out to XIV holders upon redemption.  As stated in the Registration Statement: "***It is possible that we, our affiliates, or third parties with whom we transact could receive substantial returns with respect to these hedging activities while the value of your ETNs decline or become zero***."  Of course, Credit Suisse never stated in the Registration Statement or elsewhere that it would intentionally manipulate applicable volatility markets in order to reap outsized rewards while causing XIV investors to suffer catastrophic losses.  No one would have purchased XIV ETNs at prevailing market prices if this material fact had been disclosed.  To the contrary, defendants

- 14 -

reassured investors that the Credit Suisse Defendants "*have no reason to believe that [their] . hedging activities will have a material impact on the level of the applicable underlying Index*."

44.    The role of Credit Suisse's subsidiary CSI as a calculation agent for the XIV presented an additional conflict of interest, as CSI was responsible for determining the value of the notes and the circumstances that would cause an accelerated redemption.   As stated in the Registration Statement:

> The Calculation Agents for your ETNs will have discretion in making various determinations that affect your ETNs, including the Closing Indicative Values, the applicable Redemption Amount, the occurrence and effects of an Acceleration Event and the existence and effects of Market Disruption Events.  *The exercise of this discretion by the Calculation Agents could adversely affect the value of your ETNs and may present the Calculation Agents with a conflict of interest* . . . .

45.    In essence, although it was bound by the federal securities laws to deal openly and honestly with XIV investors, Credit Suisse had both the incentive and the means to dishonestly cause the XIV's destruction in order to reap a windfall worth hundreds of millions of dollars at the expense of XIV investors.   This is precisely what would ultimately occur in contravention of the representations made by defendants in the Registration Statement, as would only later be revealed. Credit Suisse designed the XIV to fail and then intentionally precipitated the conditions of its own product's demise.  While defendants described the XIV as "risky" in the Registration Statement, in truth the product was not simply risky, but rigged – XIV was a guaranteed winner for Credit Suisse, and a surefire loser for XIV investors.

**Defendants Design the XIV to Fail**

46.    The XIV was designed to self-destruct, a crucial fact that was never disclosed to XIV investors.  While defendants told investors that the XIV was appropriate for managing daily trading risks, in fact the XIV was inappropriate for this purpose, as it was subject to a high likelihood of

catastrophic losses *in a matter of minutes*.  No reasonable investor would have invested in the XIV at prevailing market prices had the true risks and significant likelihood of catastrophic losses been disclosed by defendants.  During the Relevant Period, an investment in the XIV was like picking up pennies in front of the proverbial steamroller.  Historically low volatility, a short-volatility market imbalance, and a glut of inverse exchange-traded volatility products (including the XIV) subject to daily rebalancing made the XIV a ticking time bomb that was set to self-destruct on significant market turbulence.  While these risks manifested and increased during the Relevant Period, defendants failed to appropriately update the XIV's risk disclosures, misleading investors into believing that the XIV was just as risky as it had always been even as conditions had significantly changed and thereby exposed investors to a new and substantial likelihood of suffering catastrophic losses.

47.    Beginning in early 2017, markets entered a period of historically low volatility.  By May 2017, the VIX had closed below 10, less than half its historical average of approximately 20.  Over the course of 2017, volatility remained abnormally low.  According to analysis performed by the investment bank Goldman Sachs, the S&P 500 had a realized volatility score of 7 during 2017, which "'ranked in the first percentile since 1930.'"  Of the 56 lowest closing levels in the history of the VIX since 1990, 47 of them occurred in 2017.  The following charts illustrate the sharp decline in the level of the VIX during 2017 on daily and annualized bases, respectively:





48.     As with the VIX, the Index to which the XIV was benchmarked also declined during 2017 and remained at historically low levels throughout the year.  The following chart illustrates the abnormally low level of the Index during 2017:

**SPVXSP**



49.     The historically low market volatility meant that even a relatively modest increase in the absolute value of the Index could cause the Index to increase significantly on a percentage basis. This, in turn, would cause a proportional decrease in the value of XIV ETNs.

50.     At the same time, investments in volatility-linked ETPs and other financial instruments used to trade volatility dramatically increased.  Hundreds of millions of dollars' worth of invested capital flowed into VIX-related ETPs before and during the Relevant Period, as the number of ETPs tied to volatility increased to nearly 40 such products.  XIV was among the largest, and one

of a number of similar products offered by Credit Suisse. By January 26, 2018, Credit Suisse had

10.8 million XIV ETNs outstanding with an indicative value that totaled nearly $1.5 billion. The

amount of notes outstanding at this time represented a 26% increase in less than a year.

51.     As a consequence of this growth in volatility trading, the markets for VIX futures

contracts, SPX options, and other volatility-related financial products, such as variance swaps,

ballooned. ETP portfolio managers such as Credit Suisse and other consumers of volatility-related

financial instruments used these products to maintain portfolio leverage and maturity consistent with

investment objectives, hedge risks, and place directional bets on volatility. In addition, many of the

ETPs were leveraged, with investment objectives that sought to achieve some multiple of the

underlying volatility index (generally 2x). Like inverse ETPs, ETPs with leveraged multiples

require daily rebalancing, which ordinarily involves the buying and selling of VIX futures contracts

at the end of the trading day. Credit Suisse alone issued hundreds of millions of dollars' worth of

such products, including the TVIX ETN (2x long VIX short-term) and the TVIZ ETN (2x long VIX

medium-term).

52.     The proliferation of volatility-related products that relied on dynamic trading in the

same VIX futures and SPX option markets – in particular inverse and leveraged ETPs – created an

acute liquidity threat that ensured that the XIV would not perform as advertised in the face of

significant market turbulence. At the end of every trading day, inverse and leveraged ETPs needed

to purchase VIX futures in order to rebalance their respective portfolios and maintain the appropriate

leverage ratios. In addition, ETP providers, such as Credit Suisse, engaged in hedging activities by

buying and selling volatility-linked securities. Given the billions of dollars that had been invested in

such ETPs prior to and during the Relevant Period (in addition to the funds invested in similar

strategies outside of ETPs), any significant movement in the SPX would cause an outsized

movement in VIX futures contracts as market participants rushed to cover short positions, hedge risks, and rebalance investment portfolios in overly crowded volatility markets.  There were simply not enough VIX futures contracts available from liquidity providers to absorb such an event without a run on the market.

53.     Particularly at risk of catastrophic losses were inverse ETPs such as the XIV.  Overall investment in VIX futures during the Relevant Period was net short, as investors piled billions of dollars into bets on low volatility.  As a result, the XIV faced heightened demand in the products it needed to purchase as part of its daily rebalancing and Credit Suisse's own hedging activities.  Furthermore, the XIV rebalanced its portfolio at the end of each trading day and around the same time as other ETPs.  This meant that the XIV would generally be purchasing VIX futures contracts at times when demand was highest.  The XIV was also subject to the risk of front-running by sophisticated market participants, including Credit Suisse, with access to proprietary market data, insider knowledge about the ETPs under their management, and non-public modelling capabilities, and who had visibility into the XIV's rebalancing needs based on market movements during the trading day.

54.     As would later be revealed, these massive and undisclosed risks undermined the XIV's very viability.  All of these factors set the stage for the XIV to suffer a self-destructive feedback loop if faced with market turbulence:  if volatility significantly increased, market participants (including Credit Suisse) would rush to transact in volatility-related products, which would drive up volatility, thereby driving up the price of VIX futures contracts, thereby decreasing the XIV's net asset value, thereby necessitating that the XIV buy even more VIX futures contracts at higher prices as part of its daily rebalancing and Credit Suisse's hedging activities (along with the providers of other VIX ETPs), which would drive up volatility, and so on until the XIV collapsed

under its own weight.  The exponential growth of the XIV before and during the Relevant Period increased these imminent threats and the likelihood that the XIV would suffer enormous losses, even as defendants pocketed millions of dollars from the management of the XIV and the sale of XIV ETNs.

55.    By design, the complexity of the XIV concealed and magnified these risks, which were poorly understood even by sophisticated traders.  Many (if not most) of the investors in the XIV were retail investors who did not have access to non-public predictive models, sophisticated analytical tools, or the massive amounts of data (which included proprietary and non-public data) necessary to comprehend the true risks of the XIV or how it would actually perform in stress scenarios.  Defendants – the creators, portfolio managers and distributors of the XIV – possessed unique insider knowledge about the risks faced by the XIV throughout the Relevant Period, yet failed to apprise investors about these risks.

56.    Instead, Credit Suisse took specific acts to magnify these risks and trigger the destruction of the XIV in order to rid itself of hundreds of millions of dollars in XIV liabilities, while conspicuously failing to meaningfully update the risk disclosures in the Registration Statement. Despite the imminent threat that saturation in volatility markets posed to the XIV, on January 29, 2018, Credit Suisse offered an additional *16.3 million XIV ETNs* by means of the Registration Statement, and thereby attempted to ***more than double*** the number of XIV notes issued and outstanding.  Credit Suisse had unique visibility into the imminent threats already posed to the XIV as a result of the glut of volatility ETPs.  Notwithstanding these threats, Credit Suisse decided to more than double the number of XIV ETNs issued and outstanding, and immediately began to flood the market with millions of new XIV ETNs.  In little more than one week, the number of XIV ETNs had increased by nearly *40%* to 15 million.  The decision by the Credit Suisse Defendants to

dramatically increase the number of XIV ETNs outstanding, despite their insider knowledge that this would trigger an acute liquidity shortfall in VIX futures markets, is explained by their desire to destroy the XIV, which, predictably, their actions accomplished.

**February 5, 2018: The "Volpocalypse"**

57.     On Monday, February 5, 2018, the stock market declined, with the SPX dropping 4% amid concerns about rising bond yields and higher inflation.  On a percentage basis, this decline was less than half the greatest single-day decline in the SPX over the last 30 years (a 9% decline that occurred on October 15, 2008) and a fraction of the 20% decline in the SPX that occurred on October 19, 1987.  While bid/ask spreads for SPX options widened during the sharpest portions of the equity market decline, trading was orderly, positions remained liquid, and there was not widespread market disruption in SPX options.

58.     However, the market turbulence triggered the latent self-destruct mechanism concealed in the XIV – which Credit Suisse had just days previously precipitated via the January 2018 Offering – as the crowded market for VIX future contracts spiraled out of control.  The VIX rocketed upward to a high of 38.80 during the day, from a close of 17.31 on Friday, February 2, 2018 – a 124% daily spike.  Much of this increase occurred at the end of the trading day, as reflected in the following chart:



59.     The Index experienced a similar surge, as the price of the VIX futures contracts on which it was based jumped at the end of the trading day:



60.     The price of XIV ETNs, which track the inverse of the Index, declined. By the close

of trading on February 5, 2018, the price of XIV had dropped to $99 per ETN, from the prior close

of $115.55 per ETN, a 14% decline.  However, the real carnage occurred in the aftermarket, as

Credit Suisse and other ETP portfolio managers sought to rebalance ETP portfolios to maintain

appropriate leverage amounts in an illiquid VIX futures market.  In addition, Credit Suisse, armed

with its insider knowledge of VIX futures markets and the unique ability to influence these markets

as manager to some of the largest volatility-linked ETPs, engaged in proprietary trading activities to

take advantage of XIV investors under the guise of "hedging" its ETP exposure.

61.     To have fully hedged its risk on February 5, 2018, it has been estimated that Credit

Suisse needed to buy more than 105,000 VIX futures contracts by 4:15 p.m., when the daily VIX

futures' settlement values are calculated by the CBOE.  And, indeed, transaction data show a spike in trading volume in February and March VIX futures contracts to over 167,000 VIX futures contracts, or roughly one third of the entire February and March VIX futures market, just before 4:15 p.m. on February 5, 2018.  From August 2012 through August 2018, the average minute-by-minute trading volume for these futures contracts has been estimated at 1,000 contracts.  This was also the average volume on February 2, 2018.  Thus, the trading volume in the February and March VIX futures contracts during aftermarket trading on February 5, 2018 was more than 167 times the usual volume of trades.

62.     As Credit Suisse and other market participants purchased hundreds of millions of dollars' worth of VIX futures contracts, prices skyrocketed, initiating the aforementioned death spiral and eviscerating the value of XIV ETNs.  The following chart illustrates the dramatic rise in the price of March VIX futures, which occurred almost entirely after the Nasdaq close at 4:00 pm ET:



63.    This upsurge in the price of VIX futures contracts created a price dislocation due to the rebalancing of the XIV and the portfolios of other inverse and leveraged volatility ETPs.  This dislocation occurred between 4:00 pm and 4:15 pm ET, concurrent with the rebalancing of the XIV's and other ETP's portfolios and Credit Suisse's "hedging" activities, as illustrated by the following chart:



64.     On February 5, 2018, at 4:00 p.m. ET, the regular-hours market for the trading of the

XIV closed.  At close, the XIV's last trading price was $99 and its indicative value was reported at

$72.59.  Thirty minutes later, during the  after-hours market, the price per XIV ETN had dropped to

$65.50, while the XIV's reported indicative value had plummeted to $24.89.  By 4:45 p.m., the price

had further dropped to $42.81. Finally, by 6:30 p.m. the trading price of XIV ETNs had declined to

approximately $10 per note (as the indicative value settled at a mere **$4.22**), a **90% decline** from its closing price, as Credit Suisse's plan to destroy the XIV approached its catastrophic conclusion.

65.     By February 6, 2018, the price of XIV ETNs had plummeted to a low of $5.50, a one-day decline of over **94%** from the prior day's close.  The XIV essentially became the engine of its own demise, as investors suffered massive losses not simply due to volatility in equity markets, but due to the XIV's very design and its price insensitive participation in – and catalyst for – an illiquid VIX futures market, as precipitated by Credit Suisse.  The following chart illustrates the dramatic decline in the price of XIV ETNs, which essentially wiped out the entirety of the XIV's investment gains over the preceding **seven** years in a matter of minutes:



66.     Investor losses were staggering.  Billions of dollars invested in inverse and leveraged ETPs – including **more than $1.5 billion** in XIV investments – evaporated in one of the greatest wealth-destruction events since the 2008 financial crisis.  Media commentators described the shocking and complete collapse of the XIV and similar products in suitably cataclysmic terms such as "Armageddon" and the "Volpocalypse."  Others noted that investors had been "blindsided" as latent risks in the XIV and other inverse and leveraged ETPs materialized, exposing fatal design flaws that made the products far riskier than disclosed by defendants.

67.     On February 6, 2018, as a consequence of the market wreckage, trading in the XIV was temporarily halted by market regulators.  That same day, Credit Suisse announced that the sharp decline in the price of the XIV had triggered an "acceleration event" under the terms of the ETN, allowing Credit Suisse to force redemption of the notes for pennies on the dollar.  The release stated that XIV ETNs would be valued as of the closing indicative value on February 15, 2018, and redeemed at this valuation on February 21, 2018.  Investors would ultimately receive only $5.99 for each XIV ETN, even though the notes had just been sold to investors for prices as high as $134 little more than *one week* before the February 5, 2018 wealth destruction event.

68.     The collapse of the XIV was a windfall for Credit Suisse, who overnight eliminated more than $1.5 billion in redemption liability.  Credit Suisse also retained hundreds of millions of dollars in offering proceeds from the sale of XIV, and millions more from its daily management of the ETN through CSI and CSSU.  Adding further insult to injury, Credit Suisse *profited* through the proprietary trading of volatility-related securities, based on its insider knowledge and outsized role in volatility markets, at the expense of XIV investors.

69.     On February 6, 2018, Credit Suisse issued a press release proclaiming that it had "experienced no trading losses" from the XIV.  Credit Suisse would later state that it had "completely hedged" its XIV exposure by "trading XIV futures."  As stated in the Registration Statement, Credit Suisse used "hedging" with respect to the XIV to include the receipt of "*substantial returns with respect to these hedging activities while the value of your ETNs decline or become zero*."  Thus, Credit Suisse used "hedging" to refer to the receipt of profits, and not just the avoidance of losses. Indeed, on April 25, 2018, Credit Suisse reported that it had generated approximately CHF 490 million (or roughly $490 million) in revenues for its equity sales and trading division for the fiscal quarter ended March 31, 2018, *a 30% increase* compared to the

- 29 -

previous quarter, stating that the positive results were "***due to more favorable trading conditions, particularly higher levels of volatility which benefited our derivatives business***."  This represented a major turnaround for Credit Suisse's equity sales and trading division, which had posted a 19% decrease in revenues for fiscal 2017.

## 1933 ACT ALLEGATIONS

### FALSE AND MISLEADING STATEMENTS IN THE REGISTRATION STATEMENT

70.     On June 8, 2017, Credit Suisse filed a registration statement on Form F-3 with the SEC, which was subsequently amended, including by means of a prospectus supplement for the offer and sale of XIV ETNs filed on January 29, 2018 on Form 424B2, which was incorporated into and formed part of the registration statement (the "Registration Statement").

71.     The Registration Statement was negligently prepared and as a result contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

72.     Specifically, the Registration Statement failed to disclose that Credit Suisse had designed the XIV to fail and, by virtue of its decision to flood the market with XIV ETPs despite acute liquidity threats, was precipitating its self-destruction.  To the contrary, the Registration Statement represented that the XIV was "intended to be [a] trading tool[] for sophisticated investors ***to manage daily trading risks***."  Similarly, the Registration Statement stated that the XIV was "designed to achieve [its] stated investment objectives ***on a daily basis***."

73.     These statements were false and misleading because the XIV was inappropriate for managing daily trading risks, as it was subject to a high likelihood of catastrophic losses in a matter of minutes and faced the imminent threat of collapse due to the historically low volatility

environment, a short-volatility market imbalance, a glut of inverse exchange-traded volatility products (including the XIV) subject to daily rebalancing, a pronounced lack of liquidity in VIX futures and other volatility markets, and Credit Suisse's own plans to precipitate the XIV's destruction.

74.     Indeed, the Registration Statement represented that the XIV was suitable for a wide-range of investor objectives, stating in pertinent part:

The ETNs may be a suitable investment for you if:

- You seek an investment with a return linked to the performance of the applicable underlying Index.

- You are willing to accept the risk of fluctuations in volatility in general and in the level of the applicable underlying Index in particular.

- You are a sophisticated investor seeking to manage daily trading risk using a short-term investment, and are knowledgeable and understand the potential consequences of investing in volatility indices and of seeking inverse or leveraged investment results, as applicable.

- You believe the level of the applicable underlying Index will increase (if you invest in the Long ETNs or 2x Long ETNs) or decline (if you invest in the Inverse ETNs) by an amount, and at a time or times, sufficient to offset the sum of the Daily Investor Fees (and in the case of Early Redemption, the Early Redemption Charge) over your intended holding period of the ETNs and to provide you with a satisfactory return on your investment during the time you hold the ETNs.

- You do not seek current income from this investment.

- You do not seek a guaranteed return of your initial investment.

- You are a sophisticated investor using the ETNs to manage daily trading risks and you understand that the ETNs are designed to achieve their stated investment objectives on a daily basis, but their performance over longer periods of time can differ significantly from their stated daily objectives.

- You understand that the Daily Investor Fees and the Early Redemption Charge will reduce your return (or increase your loss, as applicable) on your investment.

75.     These statements were materially false and misleading because Credit Suisse had constructed the XIV to fail, and, via the January 2018 Offering, was in the process of precipitating its failure.  Because the XIV was designed to self-destruct, and due to the undisclosed materially adverse facts listed in ¶73 that made its collapse imminent, the XIV was not a suitable investment for *any* of the investor categories listed in the Registration Statement.

76.     Similarly, the Registration Statement stated that the XIV was "designed for investors who seek exposure to the applicable underlying Index."  It continued: "The return on the ETNs is linked to the daily performance of one of the Indices," and "[e]ach Index is intended to reflect the returns that are potentially available through an unleveraged investment in the relevant futures contract or contracts on the VIX Index."  The Registration Statement also stated that the XIV "should be purchased only by knowledgeable investors who understand the potential consequences of investing in volatility indices and of seeking inverse or leveraged results, as applicable," and that investors "should actively and frequently monitor their investments in the ETNs, even intra-day."

77.     These statements were false and misleading because even investors who used the XIV to express a correct view on volatility and monitored and rebalanced their portfolios regularly suffered catastrophic losses that dwarfed any potential returns or risk management utility.  The XIV essentially lost the entirety of its investment gains over the preceding seven years in a matter of minutes.  In addition, investors such as plaintiff who purchased XIV notes at the end of the trading day on February 5, 2018 would have been correct that volatility would subsequently recede, yet nevertheless lost almost the entirety of their investment in aftermarket (not "intra-day") trading.  The Registration Statement was also false and misleading because it failed to ***even mention*** the effects of aftermarket trading, let alone the fact that investors stood to lose almost the entirety of their investment outside of normal trading hours.

78.    In addition, while the Registration Statement stated that an investment in the XIV involved "risks" and that "the amount payable at maturity or upon redemption or acceleration is likely to be less than the amount of your initial investment in the ETNs," the Registration Statement was replete with contra-indicators that falsely conveyed to investors that an investment in the XIV was far less risky than it in fact was.  For example, the Registration Statement stated that the value of the XIV was "likely to be close to zero *after 20 years*" – *i.e.*, at maturity – and nowhere stated that the XIV could lose almost the entirety of its value in a matter of minutes.  Indeed, the Registration Statement presented the XIV as offering risks within the range of ordinary trading risks and offering investors the prospect of commensurate returns for accepting these risks.  For example, the Registration Statement stated that the XIV was unsuitable for investors that "prefer the lower risk and *therefore accept the potentially lower returns of fixed income investments with comparable maturities and credit ratings.*"

79.    These statements were materially false and misleading when made because they failed to disclose that the XIV was rigged in Credit Suisse's favor and, for the reasons listed in ¶73, that the XIV presented risks far outside the normal trading range – indeed it faced imminent implosion – and thus could not even "potentially" produce higher returns than fixed-income investments with comparable maturities and credit ratings.

80.    Similarly, the Registration Statement presented numerous scenarios that purportedly demonstrated how the XIV would perform in a variety of market conditions.  Each of the scenarios presented the XIV as far less risky than it in fact was.  For example, the first table presenting hypothetical scenarios in the Registration Statement showed the XIV declining 20% in the worst-case scenario.  It stated in pertinent part:

**Intraday purchase risk for Inverse ETNs or 2x Long ETNs**

The ETNs may be purchased in the secondary market at prices other than the Closing Indicative Value, which will have an effect on the effective leverage amount of any Inverse ETNs or 2x Long ETNs. Because the exposure is fixed each night and does not change intraday as the level of the applicable underlying Index moves in favor of the relevant ETN (*i.e.*, the level of the applicable underlying Index decreases for the Inverse ETNs, or the level of the applicable underlying Index increases for the 2x Long ETNs), the actual exposure in the applicable ETNs decreases. The reverse is also true. *The table below presents the hypothetical exposure an investor has (ignoring all costs, fees and other factors) when purchasing an ETN intraday given the movement of the applicable underlying Index since the prior Index Business Day's market close. The resulting effective exposure amount will then be constant for that purchaser until the earlier of (i) a sale or (ii) the end of the Index Business Day*.

| A:<br>Index<br>level | B:<br>% change in<br>Index | C:<br>hypothetical inverse<br>ETN price<br><br>C=A*(1-B) | D:<br>hypothetical inverse<br><br>ETN notional<br>exposure<br><br>D=A*-1 | E:<br>Inverse ETN<br>effective leverage<br>amount<br><br>E=D/C | F:<br>hypothetical 2x<br>ETN price<br><br>E=A*(1+2B) | G:<br>hypothetical 2x<br>Long ETNs notional<br>exposure<br><br>G=A*2 | E:<br>2x Long ETNs<br>effective<br>leverage amount<br><br>E=G/F |
|---|---|---|---|---|---|---|---|
| 120.00 | 20% | $80.00 | -$120.00 | -1.50 | $140.00 | $240.00 | 1.71 |
| 115.00 | 15% | $85.00 | -$115.00 | -1.35 | $130.00 | $230.00 | 1.77 |
| 110.00 | 10% | $90.00 | -$110.00 | -1.22 | $120.00 | $220.00 | 1.83 |
| 105.00 | 5% | $95.00 | -$105.00 | -1.11 | $110.00 | $210.00 | 1.91 |
| 104.00 | 4% | $96.00 | -$104.00 | -1.08 | $108.00 | $208.00 | 1.93 |
| 103.00 | 3% | $97.00 | -$103.00 | -1.06 | $106.00 | $206.00 | 1.94 |
| 102.00 | 2% | $98.00 | -$102.00 | -1.04 | $104.00 | $204.00 | 1.96 |
| 101.00 | 1% | $99.00 | -$101.00 | -1.02 | $102.00 | $202.00 | 1.98 |
| 100.00 | 0% | $100.00 | -$100.00 | -1.00 | $100.00 | $200.00 | 2.00 |
| 99.00 | -1% | $101.00 | -$99.00 | -0.98 | $98.00 | $198.00 | 2.02 |
| 98.00 | -2% | $102.00 | -$98.00 | -0.96 | $96.00 | $196.00 | 2.04 |
| 97.00 | -3% | $103.00 | -$97.00 | -0.94 | $94.00 | $194.00 | 2.06 |
| 96.00 | -4% | $104.00 | -$96.00 | -0.92 | $92.00 | $192.00 | 2.09 |
| 95.00 | -5% | $105.00 | -$95.00 | -0.90 | $90.00 | $190.00 | 2.11 |
| 85.00 | -15% | $115.00 | -$85.00 | -0.74 | $70.00 | $170.00 | 2.43 |
| 80.00 | -20% | $120.00 | -$80.00 | -0.67 | $60.00 | $160.00 | 2.67 |

81.     Likewise, the Registration Statement provided numerous "hypothetical examples" to "show how the ETNs would perform in hypothetical circumstances" and "illustrate the effect that different factors may have on the Maturity Redemption Amount." The Registration Statement provided four hypothetical scenarios, each of which reinforced the false and misleading impression that the XIV was subject to risks within the range of ordinary trading risks. The hypotheticals showed annualized XIV ETN returns as high as 124.44%, while the *worst-case scenario* illustrated a

loss of 85.84% annualized *over the course of one year*.  Nowhere did the Registration Statement disclose that the XIV could lose almost the entirety of its value in a matter of minutes.  Moreover, the Registration Statement failed to disclose the most important factors that would cause the XIV to lose almost the entirety of its value in a matter of minutes, including that the XIV was designed to self-destruct and that the materially adverse facts listed in ¶73 made this collapse imminent.

82.     The Registration Statement also discussed Credit Suisse's hedging activities, falsely claiming that Credit Suisse and its affiliates "***have no reason to believe that our or their hedging activities will have a material impact on the level of the applicable underlying Index***."  Of course, Credit Suisse had many reasons to believe that its hedging activities would materially impact the underlying Index to the XIV and that such effects were not only possible but certain to occur, such as the materially adverse facts listed in ¶73, including because, *inter alia*: (1) Credit Suisse was one of the largest volatility ETP providers and, in addition, engaged in hedging activities and proprietary volatility trading of sufficient size and direction to impact the Index; (2) the volatility markets were suffering from acute liquidity risks; (3) volatility ETP providers engaged in billions of dollars' worth of daily rebalancing by transacting in volatility securities; (4) this daily rebalancing occurred at around the same time across volatility ETP products, increasing demand when demand was already highest; (5) ETPs were generally price insensitive; (6) the XIV was subject to front running; (7) volatility was at historic lows; and (8) Credit Suisse would use its volatility trading to force the XIV into an accelerated redemption event.  While the Registration Statement stated that Credit Suisse's hedging activities "*may*" impact the Index, it failed to disclose a single of the many "reason[s] to believe" that Credit Suisse's hedging activities certainly *would* have a material impact on the Index, including Credit Suisse's own plan to impact the Index in order to force an accelerated redemption event of the XIV.

- 35 -

83.     Similarly, while the Registration Statement stated that there "*may*" be conflicts of interest between XIV ETN purchasers and defendants, it failed to disclose that conflicts in fact existed and were not incidental to the product, but central to its design, rendering the boilerplate statements of potential, future conflicts themselves materially misleading.  For example, the Registration Statement failed to disclose that Credit Suisse had designed the XIV to fail and had taken specific actions to force an acceleration event, such as attempting to more than double the number of XIV ETNs issued and outstanding via the January 2018 Offering despite acute liquidity threats, and would take further actions to ensure the destruction of the XIV in order to rid itself of hundreds of millions of dollars' in liabilities and reap a profit windfall.

84.     Likewise, the Registration Statement discussed Credit Suisse's ability to accelerate the redemption date of the XIV, yet failed to disclose the fact that Credit Suisse would ***precipitate*** an acceleration event, including via the January 2018 Offering, and ***actively destroy*** the XIV's indicative value in order to minimize the amount it was liable to pay out to investors upon redemption. The Registration Statement stated in pertinent part:

*Accelerated Redemption Amount*

We will have the right to accelerate the ETNs of any series in whole but not in part on any Business Day occurring on or after the Inception Date. In addition, if an Acceleration Event (as defined herein) occurs at any time with respect to any series of the ETNs, we will have the right, and under certain circumstances as described herein the obligation, to accelerate all of the outstanding ETNs of such series. In either case, upon acceleration you will receive the Accelerated Redemption Amount. The Accelerated Redemption Amount will be equal to the Closing Indicative Value on the Accelerated Valuation Date.

*         *         *

***Your ETNs may be accelerated at any time on or after the Inception Date or if an Acceleration Event has occurred and we choose to exercise our right to effect an Event Acceleration***

We have the right to accelerate the ETNs and pay you an amount equal to the Closing Indicative Value on the applicable Accelerated Valuation Date, on any

Business Day occurring on or after the Inception Date. In addition, if an Acceleration Event has occurred in our or the Calculation Agents' determination, we may choose to accelerate all of the outstanding ETNs of such series . . . .

85.     In addition, the Registration Statement described the closing indicative value of the

XIV as "designed to reflect [its] end-of-day economic value." It continued in pertinent part:

The Closing Indicative Value for any given series of ETNs on any given calendar day following the Inception Date will be equal to (1)(a) the Closing Indicative Value for that series on the immediately preceding calendar day *times* (b) the Daily ETN Performance for that series on such calendar day *minus* (2) the Daily Investor Fee for that series on such calendar day.

These statements were materially false and misleading when made because they failed to disclose that Credit Suisse would actively depress the XIV's indicative value through volatility trading in order to trigger an acceleration event and minimize the amount it had to pay out to XIV investors on redemption.

86.     Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303"), requires defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503(c) ("Item 503"), requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk." The failure of the Registration Statement to disclose that Credit Suisse had designed the XIV to fail or describe the adverse facts listed in ¶73 that made the XIV's collapse imminent violated 17 C.F.R. §229.303(a)(3)(ii), because these undisclosed risks were known to Credit Suisse and would (and did) have an unfavorable impact on the XIV's continuing operations. This failure also violated 17 C.F.R. §229.503(c), because these specific risks were not adequately disclosed, or disclosed at all, even

though they were some of the most significant factors that made an investment in XIV ETNs speculative or risky.

## COUNT I

### For Violations of §11 of the 1933 Act
### Against All Defendants

87.     Plaintiff repeats and realleges the foregoing paragraphs by reference.

88.     This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, against all defendants.

89.     This Count does not sound in fraud and plaintiff expressly disavows any allegations of fraud for the purposes of its 1933 Act claims.  Plaintiff does not allege that the Credit Suisse Defendants or the Janus Defendants had scienter or fraudulent intent, which are not elements of a §11 claim, for the purposes of its 1933 Act claims.

90.     The Registration Statement was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

91.     Credit Suisse is the registrant for the XIV ETNs sold during the Relevant Period.  As the issuer of the shares, Credit Suisse is strictly liable to plaintiff for the misstatements and omissions.

92.     Each of the defendants was responsible for the contents and dissemination of the Registration Statement.  In addition, defendants Thiam and Mathers both signed the Registration Statement and defendants CSSU and JHD served as underwriters for the January 2018 Offering.

93.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

94.     By reason of the conduct alleged herein, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

95.     Plaintiff purchased XIV ETNs pursuant to the Registration Statement.

96.     Plaintiff has sustained damages.  The value of XIV ETNs has declined substantially subsequent to and due to defendants' violations.

97.     At the time of its purchases of XIV ETNs, plaintiff was without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this complaint.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this complaint.

## COUNT II

### For Violation of §15 of the 1933 Act
### Against the Credit Suisse Defendants and Janus

98.     Plaintiff repeats and realleges the foregoing paragraphs by reference.

99.     This Count is brought pursuant to §15 of the 1933 Act against the Credit Suisse Defendants and Janus.

100.    The Individual Defendants were each control persons of Credit Suisse, CSSU and CSI by virtue of their positions as directors and/or senior officers of Credit Suisse and CSI.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Credit Suisse, CSSU and CSI.  The Individual Defendants signed the Registration Statement and were responsible for its contents.

101.    Credit Suisse controlled defendants CSI and CSSU, its wholly-owned subsidiaries, which made up a substantial portion of Credit Suisse's overall operations.  Credit Suisse also controlled the Individual Defendants and all of its employees.

102.    Janus controlled defendants JIC and JHD, its wholly-owned subsidiaries.  As Janus has stated in SEC filings, it is responsible for the strategic direction of its subsidiaries such as JIC and JHD.

103.    The defendants named herein each were culpable participants in the violations of §11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement, constructing and managing the XIV, creating and disseminating the Registration Statement, marketing and selling XIV ETNs and/or having otherwise participated in the process that allowed the offer and sale of XIV to investors be successfully completed.

## 1934 ACT ALLEGATIONS

## FALSE AND MISLEADING STATEMENTS

104.    Plaintiff repeats and realleges the foregoing paragraphs by reference.  For the reasons alleged in ¶¶72-86, the Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

## SCIENTER ALLEGATIONS

**Defendants' Roles in Creating and Maintaining the XIV**

105.    Each of the defendants knew, or at the very least recklessly disregarded, that the statements identified in ¶¶72-86 were materially false and misleading when made.  Credit Suisse, CSI, CSSU and the Janus Defendants created the XIV, designed its investment objective, and assessed the risks and likely performance of the XIV.  In addition, throughout the Relevant Period, each of the Credit Suisse Defendants and the Janus Defendants were responsible for the daily

- 40 -

management of the XIV, the calculation of the XIV's indicative value, daily rebalancing, note redemptions and issuances, statements to investors, solicitations, sales and/or risk management, as detailed herein.

106.    As a result of their role in creating and maintaining the XIV, their dynamic investing in volatility financial products, their continuous offering and redemption of XIV ETNs, their hedging of XIV exposure, and their access to necessary investments and market data (including data proprietary to the XIV), each of the defendants possessed unique knowledge about the specific and imminent risks facing the XIV during the Relevant Period, including the undisclosed threat of catastrophic losses as alleged herein.   Each of the Credit Suisse Defendants and the Janus Defendants, by virtue of their daily management of the XIV, adherence to applicable risk procedures and protocols, calculation of the indicative value, monitoring of relevant volatility markets, and other activities related to their oversight of the XIV ETN had material non-public information about the performance and the likely performance of the XIV, the movement of the underlying Index, the liquidity threats that existed or were likely to exist in volatility markets (including the market for VIX futures), the impact of daily rebalancing by volatility-linked ETPs, and other facts that apprised them of the undisclosed adverse facts detailed in ¶¶35-86.

**The Credit Suisse Defendants Took Specific
Actions to Precipitate the Failure of the XIV**

107.    In addition, the Credit Suisse Defendants took specific actions designed to precipitate the collapse of the XIV, including by flooding the market with XIV ETNs via the January 2018 Offering and by engaging in hedging and proprietary trading activities on February 5, 2018 that contributed to a dramatic price dislocation in VIX futures contracts and the destruction of the indicative value for the XIV.   This dislocation in VIX futures contracts occurred at the end of the trading day, at a time when the XIV was participating in daily inverse leverage rebalancing and, as

Credit Suisse would later admit, Credit Suisse was "hedging" its exposure to the XIV.  The timing and extent of these price dislocations, the occurrence of the February 5, 2018 volatility event only days after the January 2018 Offering, the evidence that Credit Suisse purchased more than a 105,000 VIX futures contracts at the time when the VIX futures markets were experiencing severe price dislocations, and the later admission by Credit Suisse that it had fully "hedged" its exposure to the XIV as the XIV imploded in value, demonstrates that Credit Suisse was an active participant in the run on VIX futures that crashed the XIV.   In addition, Credit Suisse has stated that it generated approximately $490 million in revenues from derivative trading in the first quarter of 2018 as a result of the opportunities provided by the quarter's heightened volatility – activity which reached its height on February 5, 2018.  The timing and magnitude of these volatility-linked trading revenues further confirm Credit Suisse's public comments that it was actively trading against the XIV at the time the XIV was collapsing.

108.    Furthermore, the Credit Suisse Defendants had unique insider visibility into the VIX futures markets as managers of some of the largest volatility-linked ETPs then available and as major participants in volatility markets.  Indeed, defendants have admitted that the participation of Credit Suisse and its affiliates was so pervasive in the relevant volatility markets during the Relevant Period that their trading activities could "adversely affect the level of the applicable underlying Index – directly or indirectly by affecting the price of the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures."

**Credit Suisse's Risk Management Systems and the**
**Personal Involvement of the Individual Defendants**

109.    The Credit Suisse Defendants had numerous risk protocols and procedures in place during the Relevant Period that confirm they would have known of, or at the very least recklessly disregarded, the adverse undisclosed facts detailed herein.  In particular, the Individual Defendants, as the senior most executive officers of Credit Suisse, made, or caused to be made, the false and misleading statements that artificially inflated the price of XIV ETNs, including by signing the Registration Statement.  Indeed, the Individual Defendants held themselves out to investors as persons particularly knowledgeable about the reasons for the XIV's collapse and the content of the Registration Statement.  For example, after the February 5, 2018 collapse of the XIV, defendant Thiam told investors that, as a result of his personal involvement in the aftermath, "*I know the [Registration Statement] by heart now*."

110.    In addition, due to the risk management structure in place at Credit Suisse, its senior executives – including the Individual Defendants – were well aware of, or at the very least recklessly disregarded, the liquidity issues in the VIX futures market that threatened the XIV.  On March 24, 2017, Credit Suisse filed its 2016 Annual Report with the SEC on Form 20-F (the "2016 Annual Report"), which detailed Credit Suisse's extensive risk protocols and reporting mechanisms.  The 2016 Annual Report stated that "the prudent taking of risk in line with our strategic priorities" was "fundamental" to Credit Suisse's business as a leading global bank and "ensuring that capital is well deployed to support business activities."  In describing Credit Suisse's "disciplined" risk culture, the 2016 Annual Report stated:

> We base our business operations on conscious and disciplined risk-taking.
>
> *            *            *
>
> –       We establish a clear risk appetite that sets out the types and levels of risk we are prepared to take.

    –      We actively monitor risks and take mitigating actions where they fall outside accepted levels.

    –      Breaches of risk limits are identified, analyzed, and escalated, and large, repeated or unauthorized exceptions may lead to terminations, adverse adjustments to compensation or other disciplinary action . . . .

111.    The 2016 Annual Report emphasized that, to ensure the effectiveness of Credit Suisse's risk controls, there was "strong involvement of senior management and the Board of Directors" in its risk management procedures.  Indeed, the 2016 Annual Report stated Credit Suisse had established a sub-committee of its Executive Board, the Capital Allocation and Risk Management Committee ("CARMC"), consisting wholly of Credit Suisse's most senior officers. CARMC met regularly on a monthly basis and included "the chief executive officers (CEOs) of [Credit Suisse] and the divisions, the Chief Financial Officer, the Chief Risk Officer (CRO), the Chief Compliance and Regulatory Officer and the Treasurer."  Thus, defendants Thiam and Mathers were members of the CARMC during the Relevant Period.

112.    Further, the 2016 Annual Report stated that CARMC also played a central role in the Credit Suisse's risk management procedures, as it was responsible for actively monitoring risks at the highest level, recommending overall risk limits to the Board, and setting and allocating risk limits among Credit Suisse's different lines of business.  It stated in pertinent part:

> [CARMC] is responsible for supervising and directing our risk profile, ***recommending risk limits*** at the Group level to the Risk Committee and the Board, establishing and allocating risk limits among the various businesses, and for developing measures, methodologies and tools ***to monitor and manage the risk portfolio***.

113.    The 2016 Annual Report explained that risk limits were critical to Credit Suisse's risk management procedures, as they were designed "to maintain our risk profile within our overall risk appetite."  It explained that "[l]imits are binding thresholds that require discussion to avoid a breach and trigger immediate remediating action if a breach occurs."  The 2016 Annual Report also stated

that, "[w]hile the primary purpose [of risk limits] is risk management, risk limits are also useful tools in the identification of trading misconduct and unauthorized trading activities."

114.    The 2016 Annual Report further stated Credit Suisse had several levels of risk limits within its extensive risk management framework, the breach of any one of which would trigger immediate escalation procedures to notify senior management.  Specifically, the 2016 Annual Report stated the "overall risk limits" for Credit Suisse were "set by the Board in consultation with the Risk Committee and are binding," and that any breach of these limits "would result in an ***immediate notification to the chairman of the Board's Risk Committee and the Group CEO***, and written notification to the full Board at its next meeting":

> The overall risk limits for the Group are set by the Board in consultation with its Risk Committee ***and are binding***.  In the rare circumstance where a breach of these limits would occur, it would result in an ***immediate notification to the Chairman of the Board's Risk Committee and the Group CEO***, and written notification to the full Board at its next meeting.  Following notification, the Group CRO may approve positions that exceed the Board limits up to a predefined level and any such approval is reported to the full Board.  Positions that exceed the Board limits by more than the predefined level may only be approved by the Group CRO and the full Board acting jointly.  In 2016 and 2015, no Board limits were exceeded.

115.    Thus, defendant Thiam, as CEO of Credit Suisse, received "immediate notification" of any and all breaches of risk limits, including those relating to XIV.

116.    The next level of risk limits was set by CARMC "[i]n the context of the overall risk appetite of the Group, as defined by the limits set by the Board and its Risk Committee." Specifically, CARMC was "responsible for allocating divisional risk limits and more specific limits deemed necessary to control the concentration of risk within individual lines of business."  The 2016 Annual Report emphasized that CARMC's "limits are binding and generally set close to the planned risk profile to ensure that any meaningful increase in risk exposures is promptly escalated."  The final level of limits was set by divisional management, who would "use a detailed framework of individual risk limits designed to control risk-taking at a granular level by individual businesses and

in the aggregate." These risk controls were intended to, among other things, "trigger senior management discussions with the businesses involved, risk management and governance committees in case of substantial change in the overall risk profile." While "divisional chief risk officers and certain other members of senior management" had authority to "temporarily increase" these more granular limits "by an approved percentage for a specified maximum period," significantly, any excess was "subject to formal escalation procedure . . . with escalation to senior management if certain thresholds are exceeded."

117.     Credit Suisse also had a Valuation Risk Management Committee ("VARMC"), which was chaired by its CFO, defendant Mathers. The VARMC "is responsible for establishing policies regarding the valuation of certain material assets and the policies and calculation methodologies applied in the valuation process." The VARMC determined Credit Suisse's Value-at-Risk ("VaR") regimen, including as it related to a product like XIV. As described in the 2016 Annual Report, the VaR metric was "one of the main risk measures for [risk] limit monitoring." It continued in pertinent part: "[VaR] quantifies the potential loss on a given portfolio of financial instruments over a certain holding period and that is expected to occur at a certain confidence level." Specifically, Credit Suisse's VaR model uses a

> two-year historical dataset, a one- day holding period and a 98% confidence level. This means that we would expect daily mark-to-market trading losses to exceed the reported VaR not more than twice in 100 trading days over a multi-year observation period. . . .   Our VaR used for limit monitoring purposes also uses a two-year historical dataset, a one-day holding period and a 98% confidence level.

Credit Suisse also "estimate[d] losses associated with unusually severe market movements," "including stressed VaR, position risk and scenario analysis."

118.     In addition, the 2016 Annual Report described another Credit Suisse risk committee, the Risk Processes & Standards Committee ("RPSC"), which "reviews major risk management processes, issues general instructions, standards and processes concerning risk management,

approves material changes in market, credit and operational risk management standards, policies and related methodologies, and approves the standards of [Credit Suisse's] internal models used for calculating regulatory capital requirements." The RPSC would have reviewed the liquidity issues and risks to Credit Suisse posed by the XIV and Credit Suisse's volatility-linked ETPs more generally.

119.  Finally, the 2016 Annual Report described the Reputational Risk & Sustainability Committee ("RRSC"), which "sets policies and reviews processes and significant cases relating to reputational risks and sustainability issues. It also ensures compliance with [Credit Suisse's] reputational and sustainability policies and oversees their implementation." In other words, the RRSC was tasked with minimizing reputational risks and preventing negative publicity, such as the negative coverage that Credit Suisse received following the destruction of the XIV.

120.  Credit Suisse's extensive risk management protocols and procedures required Credit Suisse and the Individual Defendants to become fully apprised of the undisclosed adverse facts listed in ¶¶35-86. The XIV exposed Credit Suisse to nearly $2 billion in potential liabilities by the end of the Relevant Period and was subject to extreme risks and the imminent threat of collapsing due, in substantial part, to Credit Suisse's own actions. By comparison, in 2017, Credit Suisse's entire adjusted consolidated pre-tax income was only roughly CHF 2.8 billion (about $2.8 billion). Indeed, in recognition of the material risks posed by the XIV to Credit Suisse, in July 2016 Credit Suisse changed the conditions under which it would sell new XIV ETNs, allowing it to "condition its acceptance of a counterparty's offer to purchase the ETNs on its agreement to sell to Credit Suisse certain hedging instruments consistent with Credit Suisse's hedging strategy, including but not limited to swaps." This change reflects the magnitude of the risk posed by the XIV, and would have

been reviewed and approved by the Credit Suisse Defendants pursuant to the risk management protocols and procedures detailed herein.

121.    In particular, because of their positions with Credit Suisse and CSI, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  Indeed, the Individual Defendants have acknowledged their personal involvement in the XIV given their role in Credit Suisse's overall risk management controls. On February 14, 2018, defendant Thiam was interviewed by *Bloomberg* and stated that the decision to review the risks posed by the XIV and to trigger the acceleration event on February 5, 2018 were run through the Company's extensive risk management procedures.  He stated that, while he did not make the decisions individually, they involved people "from every aspect of the business."  He stated in pertinent part:

> Because the product stopped trading, it was quasi-impossible to price, and we needed to give certainty to the market at the market open.  So before the morning – and this – *we* went through a long process, *we* don't make these decisions lightly, there are people involved from every aspect of the business, from compliance to the front office – and they collectively – I don't make those types of decisions – they collectively reached a decision which was in the interest of investors, which was to close it.

**Defendants Had the Motive and Opportunity to Commit Fraud**

122.    In addition, defendants had the motive and opportunity to commit fraud and were highly incentivized to induce investors to commit assets to the XIV by concealing the true risks of such investments.  Specifically, Credit Suisse generated hundreds of millions of dollars in proceeds from the sale of XIV ETNs.  Similarly, Janus received licensing fees from the XIV throughout the Relevant Period.  In addition, defendant CSSU charged a creation fee of up to approximately 0.15% times the closing indicative value of the XIV on the date on which Credit Suisse priced new notes,

and charged investors a redemption charge of 0.05% times the closing indicative value on the any XIV ETNs redeemed early at the investor's option.  In addition, defendant JHD received a Daily Investor Fee equal to the product of: (1) the closing indicative value of the XIV on the immediately preceding calendar day times, (2) the Daily ETN Performance for that series on the calculation day, times (3)(a) the Daily Investor Fee Factor for the XIV (which equaled 0.0135) divided by (b) 365.  As a result, in addition to the offering proceeds, the Credit Suisse Defendants and the Janus Defendants received millions of dollars more through their daily management of the XIV.  Furthermore, the greater the number of XIV ETNs that were issued, the greater the offering proceeds and management fees that would be received by defendants, strongly motivating defendants to grow the XIV as large as possible before precipitating an accelerated redemption event in order to erase their liabilities stemming from these issuances.

123.    In addition, Credit Suisse was highly incentivized to drive the indicative value of the XIV as close as possible to zero.  By the end of the Relevant Period, Credit Suisse was exposed to nearly $2 billion in potential redemption liability.  By destroying the XIV and forcing an accelerated redemption event, Credit Suisse was able to largely eliminate this liability and pay XIV investors pennies on the dollar.  Moreover, Credit Suisse, armed with its insider knowledge of the XIV and volatility markets, was able to earn profits from its trading of volatility-linked securities to the detriment of XIV investors.  In the first quarter of 2018, Credit Suisse's equity trading division generated approximately $490 million in revenues in its equity sales and trading segment, representing a 30% sequential increase, primarily due to "higher levels of volatility which benefited [its] derivative business."  Given the timing and reasons for these increased revenues, which match the timing of and reasons for the collapse of the XIV, in addition to Credit Suisse's public acknowledgement that it had completely hedged its XIV exposure through the trading of VIX futures

contracts, and the statements in the Registration Statement that "hedging" as used by defendants included Credit Suisse's receipt of "substantial returns . . . while the value of [XIV] ETNs decline or become zero," it is apparent that Credit Suisse reaped additional profits by destroying the XIV.

## LOSS CAUSATION AND ECONOMIC LOSS

124.   As detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of XIV ETNs and operated as a fraud or deceit on purchasers of XIV ETNs.  As detailed above, when the truth about defendants' misconduct was revealed, the value of XIV ETNs declined precipitously as the prior artificial inflation no longer propped up the XIV's price.  The declines in the price of XIV ETNs were the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the share price declines negate any inference that the loss suffered by plaintiff was caused by changed market conditions, macroeconomic or industry factors or XIV-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff, was a direct result of defendants' fraudulent scheme to artificially inflate the price of XIV ETNs and the subsequent significant decline in the value of the XIV ETNs when defendants' prior misrepresentations and other fraudulent conduct were revealed.

125.   At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of the XIV's business, operations and risks, as alleged herein.  Before and during the time of plaintiff's purchases of XIV ETNs, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the price of XIV ETNs to be artificially inflated.  Plaintiff purchased XIV ETNs at those artificially inflated prices, causing it to suffer millions of dollars in damages as complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

126.    At all relevant times, the market for XIV ETNs was an efficient market for the following reasons, among others:

(a)    XIV ETNs met the requirements for listing, and were listed and actively traded on the Nasdaq, a highly efficient and automated market;

(b)    according to VelocityShares' website, as of February 5, 2018, there were nearly 15 million XIV ETNs issued and outstanding, demonstrating a very active and broad market for XIV ETNs;

(c)    as a regulated issuer, Credit Suisse filed periodic public reports with the SEC;

(d)    the Credit Suisse Defendants and the Janus Defendants regularly communicated with public investors via established market communication mechanisms regarding the XIV, including the regular dissemination of information regarding the XIV on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(e)    unexpected material news about the XIV was rapidly reflected in and incorporated into the price of XIV ETNs.

127.    As a result of the foregoing, the market for XIV ETNs promptly digested current information regarding the XIV from publicly available sources and reflected such information in the price of XIV ETNs.  Under these circumstances, a presumption of reliance applies to plaintiff's purchases of XIV ETNs.

128.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims are based, in significant part, on defendants' material omissions.  Because this action involves defendants' failure to disclose material adverse information regarding the XIV's business and

operations, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

129.    Defendants' false or misleading statements alleged to be actionable herein were not forward-looking statements ("FLS"), or were not identified as such by defendants, but rather, were statements of historical and present fact, and thus did not fall within any "Safe Harbor."

130.    Defendants' verbal "Safe Harbor" warnings accompanying any of their oral FLS failed to provide meaningful cautionary statements regarding the specific facts and circumstances facing the XIV, and thus were ineffective to shield those statements from liability.

131.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Credit Suisse or Janus who knew that the FLS was false.  Further, none of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## COUNT III

### For Violation of §10(b) of the 1934 Act
### and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

132.    Plaintiff incorporates the foregoing paragraphs by reference.

133.    Defendants each disseminated or approved the false or misleading statements specified above in the Registration Statement, which they knew or recklessly disregarded were

misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

134.    These defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff in connection with its purchases of XIV ETNs.

135.    Plaintiff has suffered damages in that, in reliance on the integrity of the market, plaintiff paid artificially inflated prices for XIV ETNs.  Plaintiff would not have purchased XIV ETNs at the price paid, or at all, if plaintiff had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

136.    As a direct and proximate result of defendants' wrongful conduct, plaintiff suffered damages in connection with its purchases of XIV ETNs.

## COUNT IV

### For Violation of §10(b) of the 1934 Act
### and Rules 10b-5(a) and 10b-5(c) Promulgated Thereunder
### Against the Credit Suisse Defendants

137.    Plaintiff incorporates the foregoing paragraphs by reference.

138.    During the Relevant Period, the Credit Suisse Defendants engaged in conduct intended to mislead investors by artificially affecting the price of XIV ETNs.  Credit Suisse and the Individual Defendants employed devices, schemes, and artifices to defraud, and/or engaged in acts,

- 53 -

practices, and a course of business that operated as a fraud and deceit upon plaintiff as a purchaser of XIV ETNs.

139.    Plaintiff has suffered damages from the Credit Suisse Defendants' manipulative acts in that, in reliance on an assumption of an efficient market free of manipulation, it purchased XIV ETNs.  Plaintiff would not have purchased XIV notes at the prices it paid, or at all, if it had been aware of the Credit Suisse Defendants' manipulative conduct which artificially affected the price of XIV ETNs.

140.    As a direct and proximate result of the Credit Suisse Defendants' wrongful conduct, plaintiff suffered damages in connection with its purchases of XIV ETNs.

### COUNT V

### For Violation of §9(a)(4) of the 1934 Act
### Against the Credit Suisse Defendants, Janus and JIC

141.    Plaintiff incorporates the foregoing paragraphs by reference.

142.    During the Relevant Period, the Credit Suisse Defendants, Janus, and JIC made, had authority over or controlled the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

143.    The Credit Suisse Defendants, Janus, and JIC made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading

144.    Plaintiff has suffered damages in that, in reliance on the integrity of the market, it paid artificially inflated prices for XIV ETNs.  Plaintiff would not have purchased XIV ETNs at the prices it paid, or at all, if it had been aware that the market prices had been artificially and falsely inflated by the Credit Suisse Defendants', Janus's, and JIC's misleading statements.

145.    As a direct and proximate result of the Credit Suisse Defendants', Janus's, and JIC's wrongful conduct, plaintiff suffered damages in connection with its purchases of XIV ETNs.

## COUNT VI

### For Violation of §9(f) of the 1934 Act
### Against All Defendants

146.    Plaintiff incorporates the foregoing paragraphs by reference.

147.    During the Relevant Period, each defendant willfully participated in the Credit Suisse Defendants', Janus's, and JIC's violation of §9(a) of the 1934 Act.  All defendants willfully participated in the Credit Suisse Defendants', Janus's, and JIC's making of, or control over, untrue statements of material fact and/or omissions to state material facts necessary to make the statements not misleading

148.    Plaintiff has suffered damages in that, in reliance on the integrity of the market, it paid artificially inflated prices for XIV ETNs.  Plaintiff would not have purchased XIV ETNs at the prices it paid, or at all, if it had been aware that the market prices had been artificially and falsely inflated by the Credit Suisse Defendants', Janus's, and JIC's misleading statements.

149.    As a direct and proximate result of defendants' willful participation in the foregoing wrongful conduct, plaintiff suffered damages in connection with its purchases of XIV ETNs.

## COUNT VII

### For Violation of §20(a) of the 1934 Act
### Against Credit Suisse, the Individual Defendants and Janus

150.    Plaintiff incorporates the foregoing paragraphs by reference.

151.    Each of the defendants named herein were control persons within the meaning of §20(a) of the 1934 Act.

152.    The Individual Defendants were each control persons of Credit Suisse by virtue of their positions as directors and/or senior officers of Credit Suisse and CSI.  The Individual

Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Credit Suisse. The Individual Defendants signed the Registration Statement and were responsible for its contents and held themselves out to investors as among those most knowledgeable about the XIV.

153.    Credit Suisse controlled defendants CSI and CSSU, its wholly-owned subsidiaries, which made up a substantial portion of Credit Suisse's overall operations. Credit Suisse also controlled the Individual Defendants and all of its employees.

154.    Janus controlled defendants JIC and JHD, its wholly-owned subsidiaries. As Janus has stated in SEC filings, it is responsible for the strategic direction of its subsidiaries such as JIC and JHD.

155.    The defendants named herein each were culpable participants in the violations of §9 and §10(b) of the 1934 Act alleged in the Counts above, based on their having signed or authorized the signing of the Registration Statement, constructing and managing the XIV, creating and disseminating the Registration Statement, marketing and selling XIV ETNs and/or having otherwise participated in the process that allowed the offer and sale of XIV ETNs to investors to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.    Awarding plaintiff compensatory damages at an amount to be determined at trial and pre-judgment and post-judgment interest thereon;

B.    Awarding plaintiff's reasonable costs and expenses, including attorneys' fees; and

C.    Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  February 4, 2019

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN


*/s/ Samuel H. Rudman*

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
BRIAN E. COCHRAN
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
bcochran@rgrdlaw.com

LEEDS BROWN LAW, P.C.
JEFFREY K. BROWN
One Old Country Road, Suite 347
Carle Place, NY  11514
Telephone:  516/873-9550
516/747-5024 (fax)
jbrown@leedsbrownlaw.com

Attorneys for Plaintiff

I:\Admin\CptDraft\Securities\Cpt Credit Suisse XIV.docx

# EXHIBIT A

**Exhibit A**

**SECURITIES TRANSACTIONS**

**Account 2682**

| Date<br>Acquired | Amount of<br>ETNs Acquired | Price |
|---|---|---|
| 01/30/2018 | 100 | $120.86 |
| 01/30/2018 | 100 | $120.86 |
| 01/30/2018 | 700 | $120.88 |
| 01/30/2018 | 1,300 | $120.94 |
| 01/30/2018 | 600 | $120.78 |
| 01/30/2018 | 800 | $120.79 |
| 01/30/2018 | 50 | $120.79 |
| 01/30/2018 | 250 | $120.81 |
| 01/30/2018 | 500 | $120.80 |
| 01/30/2018 | 250 | $120.83 |
| 01/30/2018 | 250 | $120.82 |
| 01/30/2018 | 100 | $120.85 |
| 01/30/2018 | 800 | $122.27 |
| 01/30/2018 | 100 | $122.30 |
| 01/30/2018 | 1,660 | $122.38 |
| 01/30/2018 | 607 | $122.40 |
| 01/30/2018 | 1,010 | $122.39 |
| 01/30/2018 | 5,000 | $120.23 |
| 01/30/2018 | 500 | $120.23 |
| 01/30/2018 | 1,100 | $120.30 |
| 01/30/2018 | 100 | $120.30 |
| 01/30/2018 | 100 | $120.29 |
| 01/30/2018 | 200 | $120.30 |
| 01/30/2018 | 84 | $120.35 |
| 01/30/2018 | 100 | $120.36 |
| 01/30/2018 | 100 | $120.39 |
| 01/30/2018 | 2,716 | $120.39 |
| 01/30/2018 | 100 | $121.93 |
| 01/30/2018 | 100 | $121.90 |
| 01/30/2018 | 500 | $122.26 |
| 01/30/2018 | 100 | $122.33 |
| 01/30/2018 | 320 | $122.43 |
| 01/30/2018 | 300 | $122.37 |
| 01/30/2018 | 40 | $122.34 |
| 01/30/2018 | 700 | $122.00 |
| 01/30/2018 | 400 | $122.01 |
| 01/30/2018 | 50 | $122.28 |
| 01/30/2018 | 100 | $122.32 |
| 01/30/2018 | 5,000 | $120.40 |
| 01/30/2018 | 5,000 | $120.82 |
| 01/30/2018 | 5,000 | $121.04 |
| 01/30/2018 | 900 | $121.93 |
| 01/30/2018 | 3,900 | $121.92 |
| 01/30/2018 | 433 | $122.32 |
| 01/30/2018 | 820 | $122.31 |
| 01/30/2018 | 410 | $122.30 |

| Date Acquired | Amount of ETNs Acquired | Price |
|---|---|---|
| 01/30/2018 | 220 | $122.34 |
| 01/30/2018 | 50 | $122.35 |
| 01/30/2018 | 950 | $122.30 |
| 01/30/2018 | 1,180 | $122.41 |
| 01/30/2018 | 350 | $122.29 |
| 01/30/2018 | 3,900 | $122.13 |
| 02/02/2018 | 7,500 | $119.05 |
| 02/02/2018 | 100 | $119.02 |
| 02/02/2018 | 7,100 | $119.07 |
| 02/02/2018 | 7,500 | $119.43 |
| 02/02/2018 | 50 | $116.45 |
| 02/02/2018 | 5,000 | $116.52 |
| 02/02/2018 | 4,950 | $116.45 |
| 02/02/2018 | 200 | $116.74 |
| 02/02/2018 | 200 | $116.74 |
| 02/02/2018 | 4,400 | $116.76 |
| 02/02/2018 | 100 | $116.73 |
| 02/02/2018 | 100 | $116.80 |
| 02/02/2018 | 90 | $116.71 |
| 02/02/2018 | 100 | $116.72 |
| 02/02/2018 | 200 | $116.74 |
| 02/02/2018 | 40 | $116.75 |
| 02/02/2018 | 100 | $116.77 |
| 02/02/2018 | 12 | $116.77 |
| 02/02/2018 | 500 | $116.79 |
| 02/02/2018 | 160 | $116.80 |
| 02/02/2018 | 100 | $116.83 |
| 02/02/2018 | 20 | $116.83 |
| 02/02/2018 | 20 | $117.12 |
| 02/02/2018 | 200 | $117.14 |
| 02/02/2018 | 20 | $117.13 |
| 02/02/2018 | 340 | $117.16 |
| 02/02/2018 | 420 | $117.15 |
| 02/02/2018 | 100 | $117.17 |
| 02/02/2018 | 3,900 | $117.20 |
| 02/02/2018 | 600 | $117.02 |
| 02/02/2018 | 500 | $117.03 |
| 02/02/2018 | 400 | $117.03 |
| 02/02/2018 | 400 | $117.06 |
| 02/02/2018 | 100 | $117.08 |
| 02/02/2018 | 320 | $117.12 |
| 02/02/2018 | 2,641 | $117.14 |
| 02/02/2018 | 39 | $117.13 |
| 02/02/2018 | 94 | $116.73 |
| 02/02/2018 | 850 | $116.47 |
| 02/02/2018 | 1,000 | $116.59 |
| 02/02/2018 | 1,000 | $116.56 |
| 02/02/2018 | 40 | $116.52 |
| 02/02/2018 | 200 | $116.51 |
| 02/02/2018 | 400 | $116.51 |
| 02/02/2018 | 60 | $116.53 |
| 02/02/2018 | 300 | $116.57 |

| Date Acquired | Amount of ETNs Acquired | Price |
|---|---|---|
| 02/02/2018 | 1,000 | $116.56 |
| 02/02/2018 | 3,472 | $116.52 |
| 02/02/2018 | 177 | $116.52 |
| 02/02/2018 | 239 | $116.51 |
| 02/02/2018 | 1,112 | $116.53 |
| 02/02/2018 | 200 | $116.14 |
| 02/02/2018 | 100 | $116.15 |
| 02/02/2018 | 700 | $116.17 |
| 02/02/2018 | 200 | $116.42 |
| 02/02/2018 | 398 | $116.41 |
| 02/02/2018 | 300 | $116.43 |
| 02/02/2018 | 100 | $116.44 |
| 02/02/2018 | 1,000 | $116.54 |
| 02/02/2018 | 2,000 | $115.36 |
| 02/02/2018 | 2,000 | $115.44 |
| 02/02/2018 | 2,000 | $115.44 |
| 02/02/2018 | 120 | $115.29 |
| 02/02/2018 | 35 | $115.33 |
| 02/02/2018 | 845 | $115.36 |
| 02/02/2018 | 5,000 | $116.78 |
| 02/02/2018 | 1,000 | $116.61 |
| 02/02/2018 | 1,000 | $116.59 |
| 02/02/2018 | 1,000 | $116.13 |
| 02/02/2018 | 1,000 | $116.59 |
| 02/02/2018 | 1,000 | $116.56 |
| 02/02/2018 | 1,000 | $116.56 |
| 02/02/2018 | 2,000 | $115.37 |
| 02/02/2018 | 300 | $119.10 |
| 02/02/2018 | 400 | $116.78 |
| 02/02/2018 | 600 | $116.84 |
| 02/02/2018 | 2,584 | $116.86 |
| 02/02/2018 | 5,000 | $117.20 |
| 02/02/2018 | 5,000 | $116.94 |
| 02/02/2018 | 5,000 | $116.63 |
| 02/02/2018 | 5,000 | $116.20 |
| 02/02/2018 | 5,000 | $120.27 |
| 02/02/2018 | 3,152 | $116.48 |

| Date Sold | Amount of ETNs Sold | Price |
|---|---|---|
| 01/31/2018 | 900 | $128.43 |
| 01/31/2018 | 175 | $126.50 |
| 01/31/2018 | 300 | $126.45 |
| 01/31/2018 | 30 | $126.63 |
| 01/31/2018 | 400 | $126.65 |
| 01/31/2018 | 37 | $126.67 |
| 01/31/2018 | 390 | $126.70 |
| 01/31/2018 | 5,000 | $126.70 |
| 01/31/2018 | 5,000 | $126.70 |
| 01/31/2018 | 5,000 | $126.51 |
| 01/31/2018 | 5,000 | $126.61 |

| Date Sold | Amount of ETNs Sold | Price |
|---|---|---|
| 01/31/2018 | 316 | $126.70 |
| 01/31/2018 | 200 | $126.61 |
| 01/31/2018 | 500 | $126.72 |
| 01/31/2018 | 193 | $126.61 |
| 01/31/2018 | 700 | $126.60 |
| 01/31/2018 | 4,107 | $126.50 |
| 01/31/2018 | 4,500 | $126.70 |
| 01/31/2018 | 275 | $126.65 |
| 01/31/2018 | 1,000 | $126.60 |
| 01/31/2018 | 50 | $126.68 |
| 01/31/2018 | 7,025 | $126.41 |
| 01/31/2018 | 62 | $126.48 |
| 01/31/2018 | 900 | $126.41 |
| 01/31/2018 | 2,513 | $126.40 |
| 01/31/2018 | 4,684 | $126.40 |
| 01/31/2018 | 643 | $126.57 |
| 02/01/2018 | 100 | $125.40 |
| 02/02/2018 | 600 | $121.00 |
| 02/02/2018 | 100 | $121.02 |
| 02/02/2018 | 1,400 | $121.01 |
| 02/05/2018 | 10,000 | $36.00 |
| 02/05/2018 | 10,000 | $36.50 |
| 02/05/2018 | 10,000 | $38.00 |
| 02/05/2018 | 100 | $39.54 |
| 02/05/2018 | 18,408 | $39.00 |
| 02/05/2018 | 100 | $39.45 |
| 02/05/2018 | 12 | $39.06 |
| 02/05/2018 | 200 | $39.84 |
| 02/05/2018 | 10 | $39.01 |
| 02/05/2018 | 5 | $39.03 |
| 02/05/2018 | 1,100 | $39.43 |
| 02/05/2018 | 265 | $39.50 |
| 02/05/2018 | 4,354 | $39.31 |
| 02/05/2018 | 200 | $39.38 |
| 02/05/2018 | 1,645 | $39.50 |
| 02/05/2018 | 10 | $39.53 |
| 02/05/2018 | 355 | $39.54 |
| 02/05/2018 | 200 | $39.64 |
| 02/05/2018 | 100 | $39.64 |
| 02/05/2018 | 6 | $39.66 |
| 02/05/2018 | 1,395 | $39.65 |
| 02/05/2018 | 170 | $39.68 |
| 02/05/2018 | 815 | $39.71 |
| 02/05/2018 | 550 | $39.70 |

**Account 2164**

| Date Acquired | Amount of ETNs Acquired | Price |
|---|---|---|
| 02/02/2018 | 50 | $115.25 |
| 02/02/2018 | 120 | $115.80 |
| 02/02/2018 | 30 | $115.83 |
| 02/05/2018 | 10 | $114.21 |
| 02/05/2018 | 90 | $114.20 |
| 02/05/2018 | 50 | $107.75 |
| 02/05/2018 | 50 | $96.07 |
| 02/05/2018 | 50 | $104.35 |
| 02/05/2018 | 50 | $101.33 |
| 02/05/2018 | 50 | $108.34 |
| 02/05/2018 | 100 | $108.58 |
| 02/05/2018 | 100 | $112.50 |
| 02/05/2018 | 100 | $113.05 |

**Account 7912**

| Date Acquired | Amount of ETNs Acquired | Price |
|---|---|---|
| 01/30/2018 | 500 | $124.29 |
| 01/30/2018 | 30 | $123.02 |
| 01/30/2018 | 100 | $122.07 |
| 01/30/2018 | 470 | $122.99 |
| 01/31/2018 | 1,000 | $126.17 |
| 01/31/2018 | 1,000 | $125.79 |
| 02/05/2018 | 200 | $43.00 |
| 02/05/2018 | 100 | $45.03 |
| 02/05/2018 | 100 | $60.80 |
| 02/05/2018 | 100 | $70.01 |
| 02/05/2018 | 200 | $80.01 |
| 02/05/2018 | 300 | $80.01 |
| 02/05/2018 | 200 | $101.18 |

| Date Sold | Amount of ETNs Sold | Price |
|---|---|---|
| 01/31/2018 | 400 | $126.33 |
| 01/31/2018 | 980 | $126.16 |
| 01/31/2018 | 20 | $126.18 |
| 01/31/2018 | 429 | $126.07 |
| 01/31/2018 | 20 | $126.09 |
| 01/31/2018 | 18 | $126.08 |
| 01/31/2018 | 38 | $126.11 |
| 01/31/2018 | 75 | $126.12 |
| 01/31/2018 | 20 | $126.21 |
| 01/31/2018 | 100 | $127.10 |
| 01/31/2018 | 100 | $126.81 |

| Date<br>Sold | Amount of<br>ETNs Sold | Price |
|---|---|---|
| 01/31/2018 | 24 | $126.83 |
| 01/31/2018 | 876 | $126.86 |
| 02/05/2018 | 1,000 | $26.10 |
| 02/05/2018 | 200 | $99.03 |

**Account 3068**

| Date<br>Acquired | Amount of<br>ETNs Acquired | Price |
|---|---|---|
| 02/05/2018 | 500 | $39.00 |
| 02/05/2018 | 500 | $36.00 |

| Date<br>Sold | Amount of<br>ETNs Sold | Price |
|---|---|---|
| 02/05/2018 | 500 | $27.20 |

**Account 6406**

| Date<br>Acquired | Amount of<br>ETNs Acquired | Price |
|---|---|---|
| 01/30/2018 | 2,000 | $119.20 |
| 01/30/2018 | 2,000 | $120.60 |
| 01/30/2018 | 2,000 | $121.50 |

| Date<br>Sold | Amount of<br>ETNs Sold | Price |
|---|---|---|
| 01/30/2018 | 2,000 | $121.81 |
| 01/30/2018 | 2,000 | $121.76 |
| 01/31/2018 | 442 | $127.25 |
| 01/31/2018 | 1,139 | $127.00 |
| 01/31/2018 | 419 | $127.01 |